**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| MONTEREY RESEARCH, LLC, et al. | § § § | |
| v. | § | CASE NO. 2:24-CV-238-JRG |
| RENESAS ELECTRONICS CORP., et al. | § § § § | |

# CLAIM CONSTRUCTION ORDER

On August 8, 2025, the Court held a hearing to determine the proper construction of disputed terms in United States Patents No. 6,243,300, 7,089,133, 7,679,968, and 7,825,688. Before the Court is the Opening Claim Construction Brief (Dkt. No. 110) filed by Plaintiff Monterey Research, LLC. Also before the Court are the Responsive Claim Construction Brief (Dkt. No. 117) filed by Defendant Renesas Electronics Corp., Plaintiff's reply (Dkt. No. 120), the parties' May 13, 2025 Joint Claim Construction and Prehearing Statement (Dkt. No. 81), and the parties' July 29, 2025 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 132).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

**I. BACKGROUND** .......... **2**
**II. LEGAL PRINCIPLES** .......... **5**
**III. AGREED TERMS** .......... **8**
**IV. DISPUTED TERMS IN U.S. PATENT NO. 6,243,300** .......... **8**
1. "memory cell" .......... 8
2. "channel" .......... 13
3. "spillover electrons" .......... 20
4. "substantially neutralizing said spillover electrons with said neutralizing holes moved to said channel" .......... 24
5. "briefly" .......... 25
6. "forward bias relative to said gate" .......... 25
7. "alternate between forward and reverse bias relative to said gate" .......... 25
**V. DISPUTED TERMS IN U.S. PATENT NO. 7,679,968** .......... **26**
8. "applying a positive voltage to a well of the memory cell array when the negative voltage reaches a predetermined voltage" .......... 26
9. "predetermined voltage" .......... 30
**VI. DISPUTED TERMS IN U.S. PATENT NO. 7,089,133** .......... **32**
10. "said low voltage condition" .......... 32
11. "initial sensitivity thereof" .......... 33
**VII. DISPUTED TERMS IN U.S. PATENT NO. 7,825,688** .......... **34**
12. "a bus coupling analog input/output data and digital input/output data for the plurality of circuit blocks" .......... 34
**VIII. CONCLUSION** .......... **37**
**APPENDIX A** .......... **39**

## I. BACKGROUND

Plaintiff alleges infringement of United States Patents No. 6,243,300 ("the '300 Patent"), 7,089,133 ("the '133 Patent"), 7,679,968 ("the '968 Patent"), and 7,825,688 ("the '688 Patent"). (Dkt. No. 110, Exs. A–D.)

The ’300 Patent, titled “Substrate Hole Injection for Neutralizing Spillover Charge Generated During Programming of a Non-Volatile Memory Cell,” issued on June 5, 2001, and bears a filing date of February 16, 2000. The Abstract of the ’300 Patent states:

> A method of erasing a memory cell that includes a first region and a second region with a channel therebetween that has spillover electrons and a gate above the channel, and a charge trapping region that contains a first amount of charge. The method includes generating neutralizing holes in the substrate, moving the neutralizing holes to the channel and substantially neutralizing the spillover electrons with the neutralizing holes moved to the channel.

The ’133 Patent, titled “Method and Circuit for Providing a System Level Reset Function for an Electronic Device,” issued on August 8, 2006, and bears an earliest priority date of September 16, 2003. The Abstract of the ’133 Patent states:

> A method and circuit provide a system level reset function for an electronic device. An initial reset function is provided under a low voltage condition of supply voltage, such as occur upon first energizing the electronic device. A tunable reset function is also provided, which can first be asserted at a voltage level setting less precise than that setting becomes upon tuning. Further, a boot-up reset function is provided, which provides its reset function at a voltage level setting that is set according to a calibration. Calibration can be based on data stored in a non-volatile memory, and can involve a checksum operation. The electronic device, a microcontroller for instance, is held in a reset state with any of the initial, tunable, and boot-up reset functions.

The ’968 Patent, titled “Enhanced Erasing Operation for Non-Volatile Memory,” issued on March 16, 2010, and bears an earliest priority date of May 29, 2007. The Abstract of the ’968 Patent states:

> Structures, methods, and systems for enhanced erasing operation for non-volatile memory are disclosed. In one embodiment, a semiconductor device which comprises a memory cell array having a plurality of non-volatile memory cells, a negative voltage generating circuit for applying a negative voltage to a word line of the memory cell array during an erasing operation of the memory cell array, and a positive voltage generating circuit for applying a positive voltage to a well of the memory cell array when the negative voltage reaches a predetermined voltage.

The ’688 Patent, titled “Programmable Microcontroller Architecture (Mixed Analog Digital),” issued on November 2, 2010, and bears an earliest priority date of March 16, 2004. The Abstract of the ’688 Patent states:

> A microcontroller with analog/digital Programmable System On-a-Chip (PSoC) architecture including multiple digital PSoC blocks and multiple analog PSoC blocks in a communication array having a programmable interconnect structure. The single chip design is implemented by integration of programmable digital and analog circuit blocks that are able to communicate with each other. Robust analog and digital blocks that are flash memory programmable can be utilized to realize complex design applications that otherwise would require multiple chips and/or separate applications. The PSoC architecture includes a novel array having programmable digital blocks that can communicate with programmable analog blocks using a programmable interconnect structure. The programmable analog array contains a complement of Continuous Time (CT) blocks and a complement of Switched Capacitor (SC) blocks that can communicate together. The analog blocks consist of multi-function circuits programmable for one or more different analog functions, and fixed function circuits programmable for a fixed function with variable parameters. The digital blocks include standard multi-function circuits and enhanced circuits having functions not included in the standard digital circuits. The PSoC array is programmed by flash memory and programming allows dynamic reconfiguration. That is, “on-the-fly” reconfiguration of the PSoC blocks is allowed. The programmable analog array with both Continuous Time analog blocks and Switched Capacitor analog blocks are offered on a single chip along with programmable digital blocks. The programmable interconnect structure provides for communication of input/output data between all analog and digital blocks.

In its claim construction opening brief and reply brief, Plaintiff noted its then-pending Motion to Dismiss for Lack of Standing (Dkt. No. 110 at 1–2; Dkt. No. 120 at 1). The Court denied that motion and also granted a motion to join MR Licensing LLC as a Plaintiff in the above-captioned case. (Dkt. No. 121, July 24, 2025 Order.) Plaintiff MR Licensing LLC is represented, in part, by the same counsel that represents Plaintiff Monterey Research, LLC, and, as discussed during the August 8, 2025 hearing, Plaintiff MR Licensing LLC did not seek leave to file any separate or additional claim construction briefing. This Claim Construction Order refers to the written arguments of Plaintiff Monterey Research, LLC, the oral arguments of Plaintiff Monterey

Research, LLC, and the oral arguments of Plaintiff MR Licensing LLC, collectively, as the arguments of "Plaintiff."

Shortly before the start of the August 8, 2025 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts

give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into

the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled

in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

In the May 13, 2025 P.R. 4-3 Joint Claim Construction and Prehearing Statement, no agreed-upon claim constructions were submitted. (*See* Dkt. No. 81.) The parties did, however, reach agreements during the course of claim construction briefing (*see* Dkt. No. 120 at 6 & 8), as also reflected in the parties' July 29, 2025 Joint Claim Construction Chart Pursuant to P.R. 4-5(d) (Dkt. No. 132, Ex. A at 2–3 & 6), and those agreements are set forth in Appendix A to this Claim Construction Order.

## IV. DISPUTED TERMS IN U.S. PATENT NO. 6,243,300

### 1. "memory cell"

| **"memory cell"**<br>('300 Patent, Claims 1, 27) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "multi-bit memory cell"[1] |

(Dkt. No. 81, Ex. A at 1; Dkt. No. 117 at 6; Dkt. No. 132, Ex. A at 1.)

[1] Defendant previously proposed: "multi-bit flash EEPROM cell." (Dkt. No. 81, Ex. A at 1.)

Shortly before the start of the August 8, 2025 hearing, the Court provided the parties with the following preliminary construction: "Plain and ordinary meaning."

(a) The Parties' Positions

Plaintiff argues that Defendant's proposal improperly imports limitations from preferred embodiments, and Plaintiff also argues claim differentiation as between Claims 1 and 7. (Dkt. No. 110 at 3.)

Defendant responds that "the '300 patent repeatedly characterizes multi-bit memory cells as 'the invention,' thereby limiting the scope of the term." (Dkt. No. 117 at 7.) Defendant also argues that "[i]n contrast to the multi-bit EEPROM memory cells that the specification characterizes as the invention, the specification makes clear the single bit EEPROM memory cells were part of the prior art, not the claimed invention." (*Id.* at 8.)

Plaintiff replies that "Renesas fails to provide any proper basis to exclude single-bit memory cells from the claims." (Dkt. No. 120 at 1.) Plaintiff argues that "the invention is not the cell, but the method of erasure—which the specification points out 'can still be used' with single-bit cells." (*Id.* at 2.)

The parties presented oral arguments at the August 8, 2025 hearing.

(b) Analysis

Claim 1 of the '300 Patent, for example, recites (emphasis added):

> 1. A method of erasing a *memory cell* with a substrate that comprises a first region and a second region with a channel therebetween that has spillover electrons and a gate above said channel, and a charge trapping region that contains a first amount of charge, the method comprising:
>
> generating neutralizing holes in said substrate;
>
> moving said neutralizing holes to said channel; and
>
> substantially neutralizing said spillover electrons with said neutralizing holes moved to said channel.

In some cases, when a patent "describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).

The Field of the Invention portion of the specification states:

> The present invention relates to the field of non-volatile memory devices. More particularly, the invention relates to a method of erasing multi-bit flash electrically erasable programmable and read only memory (EEPROM) cells.

'300 Patent at 1:9–13. This statement regarding what the "invention *relates to*" does not purport to limit the claimed invention. *Id.*

The specification also discloses:

> With reference to FIG. 5, *the two bit memory device of the present invention* utilizes a punch through or read through technique to read one bit when the other bit is in a programmed state.
>
> * * *
>
> Optimization parameters specific to programming and reading *two bits in the memory cell of the present invention* will now be described.

*Id.* at 10:62–65 & 15:12–14 (emphasis added).

The specification thus, in some instances, refers to "two bit" memory cells when referring to "the present invention." *Id.* Defendant also notes that Figure 1 and Figure 4A of the '300 Patent are labeled "Prior Art" and illustrate single-bit memory cells. *See id.* at 2:24–26 ("FIG. 1 illustrates a sectional view of a single bit flash EEPROM cell of the prior art utilizing Oxide-Nitride-Oxide (ONO) as the gate dielectric."), *id.* at 2:65–3:1 ("a conventional ONO EEPROM memory cell is shown in FIG. 1") & *id.* at 5:63–65 (referring to "the prior art flash EEPROM cell of FIG. 1"); *see also id.* at 2:36–38 ("FIG. 4A illustrates a sectional view of a flash EEPROM cell of the prior art showing the area of charge trapping under the gate.").

Defendant also cites disclosures regarding distinctions between single bit memory cells and two bit memory cells. *See id.* at 11:9–12 ("Thus, in the two bit memory cell, because each bit is stored in different areas of the transistor, short channel effects may become prevalent sooner than in the case of a single bit transistor."); *see also id.* at 11:14–16 ("A key concept associated with the two bit EEPROM memory cell of FIG. 5 is that for the device to operate properly, both bits must be able to be written and read."); *id.* at 11:47–48 ("It is more important to use a low $V_G$ [(gate voltage)] during reading in the two bit memory cell than in the single bit memory cell.").

The specification also discloses, however:

> The structure of a two bit flash EEPROM cell that *employs the method of erasure of the present invention* can be best understood with an understanding of how *single bit* charge trapping dielectric flash EEPROM memory cells are constructed, programmed, and read.

*Id.* at 2:61–65. This disclosure uses the phrase "the present invention" with reference to "the method of erasure" rather than with reference to a two-bit memory cell. Further, the specification discloses:

> It is important to note that although the EEPROM cell of FIG. 5 stores two bits, *support circuitry and concepts designed to work with single bit memory cells can still be used.* For example, the sense amplifier circuitry needed for the two bit memory cell is basically no different than that for the single bit memory cell. In the single bit memory cell, the sense amplifier circuitry is required to distinguish between two states, the programmed and unprogrammed states.

*Id.* at 10:38–45 (emphasis added).

This disclosure that "support circuitry and concepts designed to work with single bit memory cells can still be used" undermines Defendant's proposal of limiting the claims to two-bit memory cells, particularly in light of the claimed methods of "erasing a memory cell" reciting steps that refer to overall components of the cells as a whole rather than to anything that would appear to be bit-specific. At the August 8, 2025 hearing, Defendant argued that this disclosure

(*id.*) refers to concepts that can be used with single-bit memory cells but does not discuss using the claimed invention with single-bit memory cells. Plaintiff persuasively responded that the claimed method would work with single-bit memory cells as well as with multi-bit memory cells. The specification does not suggest otherwise, and Defendant's expert has not opined regarding this term. (*See* Dkt. 117, Ex. A, May 14, 2025 Subramanian Decl.)

Defendant's reliance on decisions in which a court gave a term a narrow meaning based on consistently limited usage of the term with reference to the "present invention" are therefore unpersuasive. For example, the *Ultimate Pointer* case cited by Defendant found that, "[t]aken together, the repeated description of the invention as a direct-pointing system, the repeated extolling of the virtues of direct pointing, and the repeated criticism of indirect pointing clearly point to the conclusion that the 'handheld device' in [the] claims . . . is limited to a direct-pointing device." *Ultimate Pointer, L.L.C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 823 (Fed. Cir. 2016). As noted above, the specification refers to single-bit memory cells, which are therefore not "completely untethered to the context of the invention," *id.*, and *Ultimate Pointer* is therefore unpersuasive. Defendant's reliance on *Verizon*, *Rembrandt*, and *SciMed* is likewise unpersuasive. *See Verizon*, 503 F.3d at 1308; *see also In re Rembrandt Techs., LP*, 496 F. App'x. 36, 40 (Fed. Cir. 2012); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure.").

To the extent Defendant maintains that interpreting "memory cell" as encompassing single-bit memory cells would read on prior art, that argument perhaps could be an invalidity argument for a later stage of this litigation, but it does not warrant narrowing the scope of "memory cell."

*See Phillips*, 415 F.3d at 1327 ("we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction") (citation omitted).

The Court therefore hereby expressly rejects Defendant's proposed constructions, and no further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The Court accordingly hereby construes "memory cell" to have its **plain meaning**.

**2. "channel"**

| **"channel"**<br>('300 Patent, Claims 1, 27) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. No. 81, Ex. A at 1; Dkt. No. 117 at 16; Dkt. No. 132, Ex. A at 1.)

Shortly before the start of the August 8, 2025 hearing, the Court provided the parties with the following preliminary construction: "region, within the memory cell, that is between the first and second regions and that is below the gate."

(a) The Parties' Positions

Plaintiff argues that "[a] term being subject to two meanings does not render it indefinite," and "the intrinsic record provides sufficient evidence to the POSITA as to what a 'channel' is." (Dkt. No. 110 at 3 (citation omitted).)

Defendant responds that "the specification and the claims use the term 'channel' to mean two different, conflicting things, with no indication of which definition should apply," and "[t]hese irreconcilable inconsistencies leave a skilled artisan with no way to determine the meaning of 'channel' with reasonable certainty." (Dkt. No. 117 at 21–22; *see id.* at 17–22 (citation omitted).)

Plaintiff replies that "[t]he '300 Patent's claims make clear that the channel is simply the area within the substrate between the first and second regions and below a gate." (Dkt. No. 120 at 3.) Plaintiff argues that Defendant's indefiniteness argument fails because the channel is a portion of the substrate, not the substrate as a whole. (*Id.*)

The parties presented oral arguments at the August 8, 2025 hearing.

(b) Analysis

As a general matter, contradictions within a claim can potentially give rise to indefiniteness. *See Media Rights Techs., Inc. v. Capital One. Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) ("[A] claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions.'") (quoting *Nautilus*, 571 U.S. at 911 n.8); *see also Competitive Techs, Inc. v. Fujitsu Ltd.*, No. 05–1237, 185 F. App'x 958, 965–66 (Fed. Cir. June 15, 2006) (internally inconsistency gave rise to indefiniteness; one limitation required "ISA structures" and another limitation excluded "ISA structures").

Here, Claim 1 of the '300 Patent, for example, recites (emphasis added):

> 1. A method of erasing a memory cell with a substrate that comprises a first region and a second region with a *channel* therebetween that has spillover electrons and a gate above said *channel*, and a charge trapping region that contains a first amount of charge, the method comprising:
>
> generating neutralizing holes in said substrate;
>
> moving said neutralizing holes to said *channel*; and
>
> substantially neutralizing said spillover electrons with said neutralizing holes moved to said *channel*.

Defendant's expert submits that "channel" is a term of art that "refers to a portion between the source and drain in a *substrate* of a memory cell." (Dkt. 117, Ex. A, May 14, 2025 Subramanian Decl. ¶ 25 (emphasis added).) Plaintiff does not contest that the word "channel," in general, has this meaning in the relevant art. (*See* Dkt. No. 110 at 3; *see also* Dkt. No. 120 at 3–4.)

Defendant argues that "[g]iven that the claim recites generating the holes in the substrate, and then moving the holes to the channel, the channel cannot be in the substrate." (Dkt. No. 117 at 18 (citing *id.*, Ex. A, May 14, 2025 Subramanian Decl. ¶ 27).) A fair reading, however, encompasses having a channel that includes at least some of the substrate, generating holes in a portion of the substrate that is outside of the channel, and moving the holes into the channel. Claim 27 is similar. Defendant thus does not show any contradiction in this regard.

Defendant also argues that Claims 1 and 27 are each internally inconsistent because each requires that the channel is *both* in the substrate *and* in the "charge trapping region."

Defendant points to disclosure of "'spillover' electrons *in the channel* can [*sic*, that can] degrade the programmed threshold voltage" ('300 Patent at 12:38–40 (emphasis added)), and Defendant cites disclosure of "substantially neutraliz[ing] the 'spillover electrons' within the channel." '300 Patent at 13:3–5; *see id.* at 12:66–13:3. Defendant argues that a contradiction arises because "[s]pillover electrons can only degrade the threshold voltage of a memory cell if they are *in the charge trapping layer*." (Dkt. No. 117 at 20 (emphasis added)), and Defendant

cites disclosures of an electrical isolation layer being "above" the channel. '300 Patent at 3:12–16, 4:41–44, 5:64–6:4 & 6:14–18.

Defendant's argument regarding internal inconsistency depends on interpreting the term "channel" as referring to a region that is limited to being within the "substrate."

On one hand, a portion of the specification discloses:

> *Above the channel* is a layer of silicon dioxide 18 that has a thickness that ranges between approximately 60 to 100 Angstroms, and which forms an electrical isolation layer *over the channel*. On top of the silicon dioxide layer 18 is a charge trapping layer 20 that has a thickness ranging from 20 to 100 Angstroms thick and preferably is comprised of Silicon nitride, $Si_3N_4$.

'300 Patent at 4:41–47 (emphasis added). The specification thus refers to a "channel" as being below the layer labeled with reference numeral 18 in, for example, Figure 6A (reproduced herein), and what is illustrated as below the silicon dioxide layer 18 in the Figures is the substrate 12.

On the other hand, the claim language, reproduced above, recites "a *memory cell* with a substrate *that comprises* a first region and a second region with a channel therebetween that has spillover electrons." As a general matter of grammar, the Court of Appeals for the Federal Circuit has noted in other contexts that the "doctrine of the last antecedent" provides that "[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent, which consists of the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence for purposes of statutory construction." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008) (emphasis omitted; internal citations and quotation marks omitted).

This doctrine, however, is a "guideline" rather than an "absolute rule." *Id.* Here, the structure of the surrounding claim language demonstrates that "spillover electrons" can be in the "channel" because the claim recites "moving said neutralizing holes to said channel" and

"substantially neutralizing said spillover electrons with said neutralizing holes moved to said channel." If the channel could not include spillover electrons, then the "neutralizing holes moved to said channel" would be unable to "substantially neutralize[e] said spillover electrons." Figures 6A and 6B illustrate spillover electrons as being in the layer labeled with reference numeral 20. Figures 6A and 6B are reproduced here:




Fig. 6A




Fig. 6B

A portion of the specification refers to this "charge trapping layer 20" as being "[o]n top of" the "silicon dioxide layer 18" that, in turn, is disclosed as being "[a]bove the channel." '300 Patent at 4:41–47 (reproduced above).

Disclosure regarding Figures 6A and 6B, however, is consistent with the claim using the term "channel" as potentially encompassing layers that are above the substrate:

> The above-described programming techniques may create "spillover" electrons in the channel can [*sic*, that can] degrade the programmed threshold voltage. In order to substantially eliminate the effect of those "spillover" electrons, the above described technique of erasing the memory cells of FIGS. 2, 3, 4B and 5 is augmented according to the present invention by first generating/injecting neutralizing hot holes from the drain 16 into the substrate 12 as shown in FIGS. 6A and 7. . . .
>
> * * *
>
> Once the neutralized holes are generated they are then *moved to the channel* by applying a voltage across the gate 24 that has a magnitude that is sufficient to energize the neutralizing holes to *surmount the silicon/silicon dioxide barrier and enter the channel as shown in FIG. 6B*. Once the neutralizing holes enter the channel they substantially neutralize the "spillover electrons" within the channel. . . .

'300 Patent at 12:38–13:7 (emphasis added).

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Based on the above-discussed context provided by surrounding claim language, above-reproduced Figures 6A and 6B, and the accompanying disclosures, the claim phrase "that comprises a first region and a second region with a channel therebetween" modifies "a memory cell" rather than "a substrate."

At the August 8, 2025 hearing, the parties agreed that the "first region" and the "second region" recited in these claims refer to the "source" and "drain" labeled in above-reproduced Figures 6A and 6B. Defendant urged that because the source and drain are in the substrate, and

because the "channel" is recited as being "therebetween," the "channel" must be in the substrate. Defendant's argument is unpersuasive because the claim, which recites "a gate above said channel," does not preclude the "channel" from extending upward toward a gate (such as labeled with reference numeral 24 in above-reproduced Figures 6A and 6B) while still being laterally between the source and the drain.

Claim 1 thus does not limit the "channel" to being only in the "substrate" and does not limit whether the "channel" encompasses a charge trapping layer or a charge trapping region. The same analysis applies to Claim 27.

Finally, dependent Claims 10 and 32 distinguish between "said channel" and "said charge trapping region" by reciting "a dielectric layer that lies *between* said channel and said charge trapping region." At first blush, this separation between the "channel" and the "charge trapping region" in these dependent claims appears to be inconsistent with the "channel" potentially encompassing some or all of a "charge trapping region," but Plaintiff persuasively argued at the August 8, 2025 hearing that whereas these dependent claims require them to be separate, these dependent claims are necessarily narrower than the claims from which they depend, such that the "channel" in the independent claims could potentially encompass the "charge trapping region."

In sum, Defendant has not shown any contradiction and thus has not shown indefiniteness. *Sonix*, 844 F.3d at 1377. The opinions of Defendant's expert are likewise unpersuasive. (*Id.*, Ex. A, May 14, 2025 Subramanian Decl. ¶¶ 24–33.) Defendant presents no alternative proposed construction, but "some construction of the disputed claim language will assist the jury to understand the claims." *TQP Dev., LLC v. Merrill Lynch & Co.*, No. 2:08-CV-471-WCB, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, J., sitting by designation).

The Court therefore hereby construes "channel" to mean **"region, within the memory cell, that is between the first and second regions and that is below the gate."**

**3. "spillover electrons"**

| **"spillover electrons"**<br>('300 Patent, Claims 1, 27) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "electrons trapped laterally to and outside of the charge trapping region that degrade the memory cell's programmed threshold voltage" |

(Dkt. No. 81, Ex. A at 1–2; Dkt. No. 117 at 10; Dkt. No. 132, Ex. A at 1.)

Shortly before the start of the August 8, 2025 hearing, the Court provided the parties with the following preliminary construction: "electrons trapped in the channel."

(a) The Parties' Positions

Plaintiff argues that "[t]he plain and ordinary meaning of 'spillover electrons' is all that is necessary, as Renesas's proposed construction of 'electrons trapped laterally to and outside of the charge trapping region that degrade the memory cell's programmed threshold voltage' is merely an attempt to read a limitation from the specification into the claims." (Dkt. No. 110 at 4.) Plaintiff also argues that the intrinsic evidence contains no lexicography or disavowal. (*Id.*)

Defendant responds that "'spillover electrons' is a coined term that has no ordinary meaning to a person of ordinary skill in the art," and "the meaning must be found in the patent." (Dkt. No. 117 at 10 (citation omitted).) Defendant urges that "the only description in the specification of what 'spillover electrons' are prescribes two key features: that they are trapped outside of, and laterally to, the charge trapping regions in the charge trapping layer; and that they degrade the threshold voltage of the memory cell." (*Id.* at 13 (citation omitted).)

Plaintiff replies that the claim language is sufficiently clear and that Defendant's proposal improperly imports limitations from specific embodiments in the specification. (Dkt. No. 120 at 4–5.)

The parties presented oral arguments at the August 8, 2025 hearing.

(b) Analysis

Claim 1 of the '300 Patent, for example, recites (emphasis added):

> 1. A method of erasing a memory cell with a substrate that comprises a first region and a second region with a channel therebetween that has *spillover electrons* and a gate above said channel, and a charge trapping region that contains a first amount of charge, the method comprising:
> generating neutralizing holes in said substrate;
> moving said neutralizing holes to said channel; and
> substantially neutralizing said *spillover electrons* with said neutralizing holes moved to said channel.

The parties agree that "spillover electrons" is a coined term that does not have any well-known meaning in the relevant art (Dkt. No. 110 at 4 ("Dr. Subramanian [(Defendant's expert)] admits that the term 'spillover electrons' is not a term of art.") (citation omitted)), and "[i]diosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification." *See Intervet, Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1315); *see also Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1356–57 (Fed. Cir. 2016) ("We agree with Facebook that these terms have no plain or established meaning to one of ordinary skill in the art. As such, they ordinarily cannot be construed broader than the disclosure in the specification."); *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1302–03 (Fed. Cir. 2004) (patent applicant "unequivocally directed the patent examiner, as well as the public, to the specification as the complete source of meaning for the disputed terms by stating that those terms 'are very adequately described in the specification

and therefore there is a complete foundation for the use of those terms in the claims.'"); Dkt. No. 117, Ex. A, May 14, 2025 Subramanian Decl. ¶¶ 34–35.

The patentee's use of quotation marks around the word "spillover" reinforces that "spillover electrons" is a coined term, and the specification discloses:

> The above-described programming techniques may create *"spillover" electrons* in the channel can [*sic*, that can] degrade the programmed threshold voltage. In order to substantially eliminate the effect of those *"spillover" electrons*, the above described technique of erasing the memory cells of FIGS. 2, 3, 4B and 5 is augmented according to the present invention by first generating/injecting neutralizing hot holes from the drain 16 into the substrate 12 as shown in FIGS. 6A and 7. Using the right bit as an example, the neutralizing holes are generated by either 1) forward biasing the drain 16 relative to the gate 24 briefly at the start of the erase cycle for an amount of time that is less than the time for recombination of the *"spillover" electrons* and the hot holes which is approximately 1 μs or 2) pulsating the drain 16 so as to alternate between forward and reverse bias relative to the gate 24 for an amount of time needed to erase the memory cell.
>
> The second mode of neutralizing holes is shown in FIG. 7 where during forward biasing the pulse applied to the drain has a width ranging from approximately 0.5 μs to 10 μs and a voltage ranging from −0.6 V to −0.8 V. At the end of forward biasing, reverse biasing is performed by generating a gate pulse, having a width ranging from approximately 1 ms to 500 ms and a voltage ranging from −1 V to −6 V, simultaneously with a drain voltage having a width ranging from approximately 1 ms to 500 ms and a voltage ranging from 4 V to 6 V.
>
> Once the neutralized holes are generated they are then moved to the channel by applying a voltage across the gate 24 that has a magnitude that is sufficient to energize the neutralizing holes to surmount the silicon/silicon dioxide barrier and enter the channel as shown in FIG. 6B. Once the neutralizing holes enter the channel they substantially neutralize the *"spillover electrons"* within the channel. The left bit is erased in a similar fashion except that a positive potential is applied to the source 14 rather than the drain 16.

'300 Patent at 12:38–13:7 (emphasis added).

Figures 6A and 6B illustrate "spillover electrons" and are reproduced above in the discussion of the term "channel." Figures 6A and 6B illustrate "spillover electrons" between a "right bit" and a "left bit," and the specification discloses electrons being "trapped" as follows

(with reference to Figure 2, but using reference numerals that also appear in above-reproduced Figures 6A and 6B):

> On top of the silicon dioxide layer 18 is a charge trapping layer 20 that has a thickness ranging from 20 to 100 Angstroms thick and preferably is comprised of silicon nitride, $Si_3N_4$. The charge trapping layer can be constructed using silicon nitride, silicon dioxide with buried polysilicon islands or implanted oxide, for example or it can be made of an oxide implanted with arsenic, for example. *The hot electrons are trapped as they are injected into the charge trapping layer so that the charge trapping layer serves as the memory retention layer.* The thickness of layer 18 is chosen to be in excess of 50 angstrom to prevent electrons from tunneling through the oxide and leaving charge trapping layer 20 during the operation of the cell. Thus, the lifetime of the cell of this invention is greatly extended relative to prior art MNOS devices. The memory cell 10 is capable of storing two bits of data, a right bit represented by the dashed circle 23 and a left bit represented by the dashed circle 21.

*Id.* at 4:44–61 (emphasis added); *see id.* at 3:9–29 (electrons "become *trapped*") (emphasis added); *see also id.* at 7:61–66 ("hot electrons are injected into and *trapped* in the charge trapping layer 20") (emphasis added).

Plaintiff urges that the meaning of "spillover electrons" is already set forth by Claims 1 and 27 by reciting that the channel between the first second region "has spillover electrons," such that, "[t]hus, electrons in the channel are 'spillover electrons.'" (Dkt. No. 117 at 4–5.)

Although the above-reproduced disclosures confirm that whether electrons are "spillover" electrons depends on their physical location, this is not self-evident from the claim language, and, as noted above, "spillover electrons" is a coined term. Construction of the term based on above-cited disclosures in the specification regarding spillover electrons being "trapped" is therefore appropriate and will assist the finder of fact. *See, e.g., Intervet*, 617 F.3d at 1287 (quoted above). Also, at the August 8, 2025 hearing, the parties agreed that "spillover electrons" are outside of the charge trapping region.

Defendant's proposal of "laterally to" the charge trapping region, however, is confusing in light of surrounding claim language. Also, as to Defendant's proposal of "*that degrade* the memory cell's programmed threshold voltage," Defendant's expert opines that "a memory cell needs a stable programmed threshold voltage to distinguish charges representing a '0' state from a '1' state," and "[t]he 'spillover electrons' need to be neutralized as they *can* degrade this critical threshold." (Dkt. No. 117, Ex. A, May 14, 2025 Subramanian Decl. ¶ 37 (emphasis added). The above-reproduced portion of the specification likewise discloses "'spillover' electrons in the channel can [sic, *that can*] *degrade* the programmed threshold voltage." '300 Patent at 12:39–40. This disclosure of an effect that spillover electrons "can" have does not amount to a definition or disclaimer and does not warrant requiring this effect as part of the construction of "spillover electrons," and the opinion of Defendant's expert in this regard is likewise unpersuasive.

The Court therefore hereby construes "spillover electrons" to mean **"electrons that are trapped in the channel and are outside of the charge trapping region."**

**4. "substantially neutralizing said spillover electrons with said neutralizing holes moved to said channel"**

| **"substantially neutralizing said spillover electrons with said neutralizing holes moved to said channel"**<br>('300 Patent, Claims 1, 27) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "combining [said spillover electrons with said neutralizing holes moved to said channel] to restore the memory cell's original threshold voltage" |

(Dkt. No. 81, Ex. A at 2; Dkt. No. 117 at 14; Dkt. No. 132, Ex. A at 1.)

Shortly before the start of the August 8, 2025 hearing, the Court provided the parties with the following preliminary construction: "combining said spillover electrons with said neutralizing holes moved to said channel to restore substantially the memory cell's original threshold voltage."

At the August 8, 2025 hearing, all parties agreed with the Court's preliminary construction.

The Court therefore hereby construes "substantially neutralizing said spillover electrons with said neutralizing holes moved to said channel" to mean **"combining said spillover electrons with said neutralizing holes moved to said channel to restore substantially the memory cell's original threshold voltage."**

**5. "briefly"**

Plaintiff submits that, as to this term in Claim 2 of the '300 Patent, "[t]he parties agree on Renesas's revised construction: 'in an amount of time that is less than the time for recombination of the spillover electrons and the neutralizing holes, which is approximately 1 microsecond.'" (Dkt. No. 120 at 6; *see* Dkt. No. 132, Ex. A at 2.) The parties' agreement is set forth in Appendix A to this Claim Construction Memorandum and Order.

**6. "forward bias relative to said gate"**

Plaintiff submits that, as to this term in Claim 3 of the '300 Patent, "[t]he parties agree to Renesas's corrected construction[]." (Dkt. No. 120 at 6 (citation omitted); *see* Dkt. No. 132, Ex. A at 2.) The parties' agreement is set forth in Appendix A to this Claim Construction Memorandum and Order.

**7. "alternate between forward and reverse bias relative to said gate"**

Plaintiff submits that, as to this term in Claims 4 and 27 of the '300 Patent, "[t]he parties agree to Renesas's corrected construction[]." (Dkt. No. 120 at 6 (citation omitted); *see* Dkt.

No. 132, Ex. A at 2–3.) The parties' agreement is set forth in Appendix A to this Claim Construction Memorandum and Order.

## V. DISPUTED TERMS IN U.S. PATENT NO. 7,679,968

### 8. "applying a positive voltage to a well of the memory cell array when the negative voltage reaches a predetermined voltage"

| **"applying a positive voltage to a well of the memory cell array when the negative voltage reaches a predetermined voltage"** ('968 Patent, Claims 1, 9) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "applying a positive voltage to a well of the memory cell array in the event that the negative voltage reaches a predetermined voltage" |
| **"applying a positive voltage to the well when the negative voltage reaches a predetermined voltage"** ('968 Patent, Claim 14) | |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "applying a positive voltage to the well in the event that the negative voltage reaches a predetermined voltage"[2] |

(Dkt. No. 81, Ex. A at 3; Dkt. No. 117 at 24–25; Dkt. No. 132, Ex. A at 4.)

Shortly before the start of the August 8, 2025 hearing, the Court provided the parties with the following preliminary construction: "applying a positive voltage to a well of the memory cell array, which is triggered when the negative voltage reaches a predetermined voltage"; and "applying a positive voltage to the well, which is triggered when the negative voltage reaches a predetermined voltage."

[2] Defendant previously proposed: "applying a positive voltage to a well in the event that the negative voltage reaches a predetermined voltage." (Dkt. No. 81, Ex. A at 3 (emphasis added).)

(a) The Parties' Positions

Plaintiff argues that "Renesas merely proposes changing 'when' in the claim to 'in the event that,' and "[r]ewriting the claims in such a manner is improper and confusing to the jury." (Dkt. No. 110 at 6.)

Defendant responds that "the word 'when' in these two phrases indicates a cause-and-effect relationship between the negative voltage reaching a predetermined voltage and applying a positive voltage," and, "[t]hat is, the positive voltage is applied 'when,' or 'in the event that,' the negative voltage reaches a predetermined voltage." (Dkt. No. 117 at 25.) Defendant argues that "[t]he claims require the negative voltage reaching a predetermined voltage to trigger application of the positive voltage." (*Id.*) Defendant urges that "the description of the crux of the invention in the specification emphasizes what is plainly true based on the claim language: that there is a causal relationship between the negative voltage at the gate reaching a sufficiently negative voltage, and applying a positive voltage at the well." (*Id.* at 27.)

Plaintiff replies that the claims here at issue do not require a causal relationship, and "[t]he recitation of a cause-and-effect status in Claim 4 strongly suggests that it should not be read into the other claims." (Dkt. No. 120 at 6–7.)

The parties presented oral arguments at the August 8, 2025 hearing.

(b) Analysis

Claim 1 of the '968 Patent, for example, recites (emphasis added):

> 1. A semiconductor device comprising:
>
> a memory cell array having a plurality of non-volatile memory cells;
>
> a negative voltage generating circuit for applying a negative voltage to a word line of the memory cell array during an erasing operation of the memory cell array; and
>
> a positive voltage generating circuit for *applying a positive voltage to a well of the memory cell array when the negative voltage reaches a predetermined*

> *voltage*, wherein there is a timing gap between a start of the applying the negative voltage and a start of the applying the positive voltage.

In common parlance as well as in patent claims, the word "when" usually connotes a cause-and-effect relationship. *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1340 (Fed. Cir. 2011) ("the court properly construed the claim terms 'in response to' and 'when' to require a cause-and-effect relationship"). Nothing in Claim 1 of the '968 Patent implies anything other than a cause-and-effect relationship. On the contrary, the patentee's use of the word "reaches" in the phrase "when the negative voltage *reaches* a predetermined voltage" reinforces that "when" connotes a cause-and-effect relationship. Claims 9 and 14 are the same in this regard.

Plaintiff cites the subsequent recital of a "timing gap" in all of these claims as purportedly demonstrating that the claims could be satisfied by a timing relationship, not a cause-and-effect relationship. As an alternative to construing these disputed terms to have their plain meaning, Plaintiff proposed at the August 8, 2025 hearing that Defendant's proposal could be modified by replacing the phrase "in the event that" with the word "after."

The recital of a timing gap can be readily read as requiring some amount of time to elapse between the "cause" and the resulting "effect," which does not undercut the connotation of a cause-and-effect relationship. If anything, the separate, explicit recital of a "timing gap between a start of the applying the negative voltage and a start of the applying the positive voltage" reinforces that "when" connotes something more than merely timing.

The recital of "wherein the applying the positive voltage to the well is *initiated* when the operating signal is received by the positive voltage generating circuit" in dependent Claims 4 and 17, cited by Plaintiff, does not compel otherwise. Plaintiff argues that these dependent claims weigh against including a cause-and-effect relationship in the independent claims, but these dependent claims refer to an "operating signal" that is introduced in intervening dependent claims.

To the extent, if any, that the doctrine of claim differentiation can be applied, any inference is minimal because of additional limitations present in these dependent claims, such as the "operating signal." *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, *and that limitation is the only meaningful difference between the two claims*.") (emphasis added).

As for the proper construction, referring to the "applying . . ." being "triggered" by the negative voltage reaching a predetermined threshold will be more readily understandable to the finder of fact than Defendant's proposal of replacing "when" with "in the event that." This is consistent with the specification. *See* '968 Patent at 4:60–5:10 ("[W]hen the negative voltage, which is the word line voltage Vword, reaches the constant voltage Vword0, the well voltage applying circuit 22 applies a positive voltage (e.g., well voltage Vwell) to the well 33 of the memory cell array 10.").

This construction clarifies that the triggering is voltage-based rather than time-based, as discussed above, and, despite Plaintiff's arguments at the August 8, 2025 hearing, this construction is consistent with Plaintiff's apparent understanding of the "predetermined voltage." (Dkt. No. 110 at 6–7 ("The 'predetermined voltage' in the '968 Patent (attached as Exhibit B) is merely a voltage at which certain actions are *triggered*. *See Claim 1*.") (emphasis added).)

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| "applying a positive voltage to a well of the memory cell array when the negative voltage reaches a predetermined voltage" | **"applying a positive voltage to a well of the memory cell array, which is triggered by the negative voltage reaching a predetermined magnitude"** |
| "applying a positive voltage to the well when the negative voltage reaches a predetermined voltage" | **"applying a positive voltage to the well, which is triggered by the negative voltage reaching a predetermined magnitude"** |

**9. "predetermined voltage"**

| **"predetermined voltage"**<br>('968 Patent, Claim 1, 9, 14) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "voltage that prevents the negative voltage applied to the word line from rising close to or above 0V after the positive voltage is applied to the well" |

(Dkt. No. 81, Ex. A at 3; Dkt. No. 117 at 27; Dkt. No. 132, Ex. A at 4.)

Shortly before the start of the August 8, 2025 hearing, the Court provided the parties with the following preliminary construction: "Plain and ordinary meaning."

(a) The Parties' Positions

Plaintiff argues that "[t]he plain meaning of this term should be adopted, because Renesas's proposed construction lacks clarity ('close to or above 0V') and also imports limitations from the specification into the claims." (Dkt. No. 110 at 6.)

Defendant responds that its proposed construction "does not improperly import limitations from the specification, as Monterey contends"; "[i]t simply gives the claim terms the meaning[s] that were used by the applicants in explaining the scope of their invention." (Dkt. No. 117 at 28 (citation omitted).) Defendant also submits that Plaintiff has not challenged Defendant's use of

"close to" and, moreover, Defendant submits that "[w]ords of approximation are not inherently indefinite." (*Id.* at 28 (citation omitted).)

Plaintiff replies that "[t]he '968 Patent explains that the predetermined voltage is merely a threshold at which an action takes place (applying a positive voltage to the well)" and that Defendant's proposal would exclude disclosed embodiments. (Dkt. No. 120 at 7.)

The parties presented oral arguments at the August 8, 2025 hearing.

(b) Analysis

Claim 1 of the '968 Patent, for example, recites (emphasis added):

> 1. A semiconductor device comprising:
> a memory cell array having a plurality of non-volatile memory cells;
> a negative voltage generating circuit for applying a negative voltage to a word line of the memory cell array during an erasing operation of the memory cell array; and
> a positive voltage generating circuit for applying a positive voltage to a well of the memory cell array when the negative voltage reaches a *predetermined voltage*, wherein there is a timing gap between a start of the applying the negative voltage and a start of the applying the positive voltage.

The specification discloses:

> According to the embodiment, as in step S10 of FIG. 5, the X decoder 13, which is the first voltage applying section, applies a negative voltage to the word line WL of the memory cell array 10 during the erasing operation. As in step S16, when the negative voltage, which is the word line voltage Vword, reaches the constant voltage Vword0, the well voltage applying circuit 22 applies a positive voltage (e.g., well voltage Vwell) to the well 33 of the memory cell array 10. Accordingly, as shown at B in FIG. 6, the rise of the word line voltage Vword due to capacitive coupling of the well 33 and the word line WL occurs after time t1. Thus, the word line voltage Vword increases only after the word line voltage Vword is sufficiently dropped. Accordingly, it is possible to *prevent the word line voltage Vword from rising close to or above 0V* as illustrated in FIG. 3 (See point A). Thereby, it is possible to prevent a phenomenon that the word line voltage Vword at the constant voltage Vword0′ being insufficiently negative as described with reference to FIG. 3.
>
> The predetermined voltage may be a voltage other that [*sic*, than] the constant voltage Vword0 as long as the voltage prevents the word line voltage Vword from rising close to or above 0V. However, as in the embodiment, it is preferable that

> the regulator circuit 18 maintains the negative voltage V− at the constant voltage Vword0. Accordingly, by coinciding the timing of the regulator circuit 18 maintaining the voltage at the constant voltage with the timing of the well voltage applying circuit 22 applying a positive voltage to the well 33, it is possible to *prevent the word line voltage Vword from rising close to or above 0V*.

’968 Patent at 4:60–5:21 (emphasis added).

Defendant has not demonstrated that this is a coined term or that the patentee narrowly defined this term. Rather, on its face, “predetermined voltage” is a generic term, and Defendant’s proposal of referring to “0V” (that is, zero volts) would improperly import a specific feature of particular disclosed embodiments. *See Comark*, 156 F.3d at 1187.

The Court therefore hereby expressly rejects Defendant’s proposed construction, and the Court need not reach Plaintiff’s argument that Defendant’s proposed use of the phrase “close to” from the specification is too amorphous.

The Court accordingly hereby construes “predetermined voltage” to have its **plain meaning**.

## VI. DISPUTED TERMS IN U.S. PATENT NO. 7,089,133

### 10. “said low voltage condition”

Defendant, in its responsive brief, submits: “Renesas does not contend that the term ‘said low voltage condition’ of the ’133 patent is indefinite if claim 13 is corrected to depend from claim 12.” (Dkt. No. 117 at 30 n.7.) Plaintiff’s reply brief submits that “Renesas admits that the Court can correct Claim 13 to properly depend on Claim 12, and that the result is not indefinite.” (Dkt. No. 120 at 8 (citing *id.*).) In the parties’ July 29, 2025 Joint Claim Construction Chart Pursuant to P.R. 4-5(d), the parties submit the following as an agreed construction: “Plain and ordinary meaning on the condition that claim 13 is corrected to depend from claim 12.” (Dkt.

No. 132, Ex. A at 6.) At the August 8, 2025 hearing, the parties agreed the Court should correct Claim 13 to depend from Claim 12 (instead of depending from Claim 11).

Based on this agreement between the parties, the Court finds that judicial correction is permissible and appropriate for the present case. *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) (judicial correction of an error in a patent may be available "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.").

The Court accordingly hereby corrects Claim 13 to depend from Claim 12, and the Court hereby construes "said low voltage condition" to have its **plain meaning**.

**11. "initial sensitivity thereof"**

As to "initial sensitivity thereof" in Claim 13 of the '133 Patent, Plaintiff submits:

> Renesas claims that this term should be construed to mean "second reset assert signal's initial sensitivity." Claim 13 of the '133 Patent requires "wherein said second reset detector is tunable for setting a voltage level for triggering said second reset assert signal with a precision of voltage sensitivity greater than an initial sensitivity thereof." Monterey agrees to this construction.

(Dkt. No. 110 at 8 (citation omitted).) Plaintiff thus agrees to Defendant's proposed construction. (*See id.*; *see also* Dkt. No. 132, Ex. A at 6.) The parties' agreement is set forth in Appendix A to this Claim Construction Order.

## VII. DISPUTED TERMS IN U.S. PATENT NO. 7,825,688

### 12. "a bus coupling analog input/output data and digital input/output data for the plurality of circuit blocks"

| **"a bus coupling analog input/output data and digital input/output data for the plurality of circuit blocks"**<br>('688 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "a bus that carries analog data and digital data between the plurality of circuit blocks, where analog data excludes digitized analog data" |

(Dkt. No. 81, Ex. A at 4; Dkt. No. 117 at 29; Dkt. No. 132, Ex. A at 7.)

Shortly before the start of the August 8, 2025 hearing, the Court provided the parties with the following preliminary construction: "a bus that carries analog data and digital data between the plurality of circuit blocks."

(a) The Parties' Positions

Plaintiff argues that "Renesas's proposed 'exclusion' is inappropriate, as digitized analog data may still be considered analog data." (Dkt. No. 110 at 8.) Plaintiff also argues that the intrinsic evidence contains no lexicography or disavowal. (*Id.*)

Defendant responds that "[b]y definition, *digitized* analog data is no longer analog," and "the specification distinguishes analog data and digitized analog data, referring to the latter as 'digital data.'" (Dkt. No. 117 at 29–30.) Defendant argues that "Renesas's proposed construction merely re-affirms a limitation already present: that a bus must carry analog data, distinct from digital data." (*Id.* at 30.)

Plaintiff replies that "Renesas focuses on the output of the MFBs (described as digital data), it ignores the digitized analog data that is *input* to the MFBs." Dkt. No. 120 at 8 (citation omitted).

At the August 8, 2025 hearing, Plaintiff MR Licensing LLC and Defendant presented oral arguments as to this term.

(b) Analysis

Claim 1 of the '688 Patent recites (emphasis added):

> 1. A circuit comprising:
> a plurality of circuit blocks, wherein at least one of the circuit blocks is an *analog* circuit block and at least one of the circuit blocks is a *digital* circuit block;
> *a bus coupling analog input/output data and digital input/output data for the plurality [of] circuit blocks*; and
> a clock controlling the coupling of the analog input/output data and the digital input output data to the bus.

Nothing on the face of the claim suggests that the phrase "analog input/output data" excludes digitized analog data, as Defendant proposes.

The Related Art section of the specification states:

> Microcontrollers may have embedded processors, memories and special function *analog and digital circuits*. Typical *analog circuits* found in prior art microcontrollers include Continuous Time (CT) amplifiers having preset functions with given functional parameters. For instance, a CT analog amplifier might be configured as a fixed function circuit, such as a voltage amplifier, in which certain parameters, such as gain or bandwidth might be altered by programming.
>
> Switched Capacitor (SC) *analog circuits* are also frequently incorporated into microcontroller designs. SC analog circuits in prior art are somewhat more versatile than CT analog circuits in that it might be possible to alter both the circuit function as well as the parameters of the circuit function by programming. However, both CT and SC analog circuits found in current microcontrollers generally require programming before utilization, and neither can be dynamically programmed (programmed "on-the-fly").
>
> In the conventional art, general purpose *digital circuits* are frequently included in a microcontroller implementation. Such digital circuits are pre-programmed to realize certain digital functions such as logical operations, arithmetical functions, counting, etc. These digital circuits are generally in the form of a Programmed Logic Array (PLA) or FPGA. Furthermore, such digital circuits that require pre-programming are generally not dynamically programmable (programmable "on-the-fly"). The main difficulty here is in the generality of such a digital circuit, which requires an excessive amount of digital logic, which in turn occupies a large area on a semiconductor chip as well as an increased cost of manufacturing.

> * * *
>
> What is needed is a method and/or system which can be dynamically programmed to complete a complex communication interface between analog circuits and digital circuits in order to realize a desired microcontroller circuit function. What is also needed is a method and/or system that can utilize both CT and SC analog circuits implemented along with digital circuits on a single semiconductor chip. Further, what is needed is a method and/or system in which the functions and/or function parameters of the analog circuits and the digital circuits can be reconfigured by dynamic programming (programming "on-the-fly"). Further still, what is needed is a circuit and/or system in which a reduction of the digital logic implemented to realize a dynamically programmable digital circuit results in a reduction in required semiconductor chip area.

'688 Patent at 1:28–58 & 2:3–17 (emphasis added). The specification further discloses that an analog signal can be digitized:

> The *analog output signal from any analog amplifier* ACT 220, SC1, 221 or SC2, 222 is also made available as an input to any one of eight digital circuits, four MFBs 230 and four MFBe 231, under control of the Interrupt Controller 206. These eight digital circuits correspond to the Digital SoCblocs 122 illustrated in FIG. 1. Similarly, a digital output from any one of the eight digital circuits, four MFBs 230 and four MFBe 231, can be presented under control of the Interrupt Controller 206 as an input to any one of the twelve analog amplifiers ACT 220, SC1, 221 or SC2, 222.
>
> The Interrupt Controller 206 and the System Clocks 207 couple digital signals between any one of the eight digital circuits, four MFBs 230 and four MFBe 231, and the Internal I/O Bus 240 which is illustrated 127 in FIG. 1. Digital signals are coupled to the semiconductor chip by means of forty (40) individual pins which form ports 0 through 4, 241.
>
> Exemplary Digital/Analog Function
>
> FIG. 3 is a flow chart illustrating steps 300 in a *combined analog/digital operation* possible with the Programmable System On-a-Chip (PsoC) according to the present invention. Component reference numbers used are as assigned in FIG. 2. An *analog signal to be digitized* is presented in step 310 at one of the pins of the analog port 0, 210 in FIG. 2. Under control of the Analog Clock 205, the analog input signal is coupled in step 320 via a MUX 215 to the input of an SC1 amplifier 221 configured as an integrator with an internal comparator. In step 330, the output of the SC1 amplifier 221 is represented as a digital input signal which is applied to two MFBs 230 configured as an eight bit digital counter. Under the control of the Interrupt Controller 206 and System Clocks 207, the two MFBs 230 accumulate and store

> *the digital conversion of the analog input signal* in step 340. The *resulting digital data* is then coupled in step 350 via the Independent Internal I/O Bus 240 to a digital output port such as port 0, 241 in FIG. 2.

’688 Patent at 5:55–6:21 (emphasis added); *id.* at 6:39–44 (“It is to be appreciated that a series of pulses taken from an external device that are not satisfactory digital signals could be entered as an analog signal which is then routed through an analog amplifier ACT 220, SC1 221 or SC2 222 in order to produce a digital signal that is then routed to a designated MFB 230.”).

The parties’ arguments demonstrate potential disputes regarding whether “analog input/output data” is present in an accused instrumentality or whether particular data is digital. These are factual disputes regarding infringement, not legal questions for claim construction. Defendant argues that, “[b]y definition, digitized analog data is no longer analog,” but the above-reproduced disclosure from the specification demonstrates that whether particular data is “analog” or “digital” depends on implementation-specific details. Also, Plaintiff persuasively argued at the August 8, 2025 hearing that whereas Defendant’s proposal refers to a bus carrying data, the claim and the specification refer to a bus providing connections but do not limit the manner in which the bus operates.

The Court therefore hereby construes “a bus coupling analog input/output data and digital input/output data for the plurality of circuit blocks” to mean **“a bus that connects analog input/output data and digital input/output data between the plurality of circuit blocks.”**

## VIII. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other’s claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court,

in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 22nd day of August, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**APPENDIX A**

| Term | Agreed Construction |
| --- | --- |
| "briefly"<br>('300 Patent, Claim 2) | "in an amount of time that is less than the time for recombination of the spillover electrons and the neutralizing holes, which is approximately 1 microsecond" |
| "forward bias relative to said gate"<br>('300 Patent, Claim 3) | "applying a higher voltage to the gate than to the first region" |
| "alternate between forward and reverse bias relative to said gate"<br>('300 Patent, Claim 4, 27) | "alternate between applying a higher voltage to the gate than to the first region and applying a lower voltage to the gate than to the first region" |
| "initial sensitivity thereof"<br>('133 Patent, Claim 13) | "second reset assert signal's initial sensitivity" |

Dkt. No. 120 at 6 & 8; Dkt. No. 132, Ex. A at 2 & 6.